# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| BB SYNDICATION SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09-cv-1268 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| LM CONSULTANTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff BB Syndication Services, Inc. ("BBSS") brought this diversity action against defendant LM Consultants, Inc. ("LM") alleging breach of contract, negligence, professional negligence, and negligent misrepresentation. Currently before the court is LM's motion for partial summary judgment requesting that the court enforce a limitation of liability clause in LM's consulting contract with BBSS.[1] For the foregoing reasons, the court grants LM's motion. Because the court finds that the limitation of liability clause is valid and enforceable, LM's potential liability is limited to an amount below the statutorily required threshold for diversity jurisdiction. Therefore, the court dismisses the action for lack of subject matter jurisdiction under 28 U.S.C. § 1332(a).

### I. BACKGROUND

BBSS is a Wisconsin corporation, with its principal offices in Madison, Wisconsin; LM is an Illinois corporation with its principal offices in Vernon Hills, Illinois. (LM's Statement of

---

[1] The court treats LM's "motion for summary determination" as a motion for partial summary judgment under Rule 56(a).

Undisputed Material Facts ("Statement of Facts") ¶¶ 1-2.)[2] BBSS and LM entered into an Agreement for Construction Evaluation and Monitoring Services (the "LM Agreement") on December 12, 2005, in connection with the Park Condominiums project located at 222 South Caldwell Street, Charlotte, North Carolina (the "Project"). (Statement of Facts ¶ 5.) The LM Agreement provided that LM would perform certain services related to the Project's pre-construction ("pre-construction phase services"), and construction phases ("construction phase services"). (Statement of Facts, Ex. B, (the LM Agreement) at 1-3.) Pre-construction phase services included reviewing certain Project documents and conducting a construction cost review. (LM Agreement at 1-2.) The construction phase services required LM to provide field reports that reviewed "construction progress, compliance with the Project Schedule, Appropriateness of the Contractor's Application for Payment, Change of Orders, Compliance with Project Documents, and Quality of the work." (LM Agreement at 2.)

In its complaint, BBSS alleges that, based on LM's representations and certifications to BBSS that the Project could be constructed for $33,937,000, BBSS "entered into numerous agreements with other parties to become the lender for the Project," including entering into a Construction Loan Agreement with 222 South Caldwell Street Limited Partnership, the Project's owner. (Am. Compl. ¶¶ 7-8.) BBSS asserts that it advanced a total sum of $26,168,876 in connection with the Project based on LM's representations made pursuant to the LM Agreement. (*Id.* ¶ 10.) BBSS claims that while LM initially represented that the Project was approximately seventy percent complete in February 2008, in March 2008 the Project's owner and contractor informed BBSS that additional funds were needed. (*Id.* ¶¶ 11-12.) In April 2008, LM reviewed the owner's representations and reported that $34,500,000 in additional funds would be needed

---

[2] BBSS does not dispute any of the facts in LM's Statement of Undisputed Material Facts. (*See* BBSS's Response to LM's Statement of Undisputed Material Facts ¶¶ 1-18.) The six additional facts submitted by BBSS are not relevant in determining this motion. (*See id.* ¶¶ 19 – 24.)

to complete the Project. (*Id.* ¶ 12.) Because the Project's owner had defaulted under the Construction Loan Agreement, BBSS ceased advancing funds in connection with the Project, the Project's owner was placed into an involuntary bankruptcy proceeding, and the Project was foreclosed. (*Id.* ¶ 13.) BBSS subsequently filed this lawsuit against LM.

The LM Agreement contained the following provision (hereinafter the "LM limitation of liability clause"):

> Client [BBSS] and persons claiming through Client agree to limit the liability of the Consultant [LM] for all claims arising out of, in connection with, or resulting from the performance of this Agreement to the amount of fees paid under this Agreement.

(Statement of Facts ¶ 11; LM Agreement at 4.) Defendants argue that this clause limits their potential liability to BBSS to the amount of fees BBSS paid to LM under the LM Agreement. BBSS paid a total of $43,500 in fees to LM. (Statement of Facts ¶ 12.) Presently at issue is whether the LM limitation of liability clause is valid and enforceable and if it applies to all of BBSS's claims against LM. If so, BBSS's potential recovery from LM is capped at $43,500.

BBSS's amended complaint consists of four state-law-based claims against LM: breach of contract, "ordinary negligence," "professional negligence," and negligent misrepresentation. BBSS requests relief for each claim "in an amount sufficient to fully compensate [BBSS] for all damages, costs and other expenses as proven." (Am. Compl. ¶ 27.) There is complete diversity of citizenship between the parties.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

At the summary judgment stage, the court should view the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor. *Cedillo v. Int'l Ass'n of Bridge and Structural Iron Works, Local Union No. 1*, 603 F.2d 7, 11 (7th Cir. 1979).

### III. ANALYSIS

Because there are no disputes as to any material fact pertaining to the LM limitation of liability clause, the issue of its validity and enforceability is ripe for summary judgment. *See* Fed. R. Civ. P. 56(a).

**A. Applicable Law**

The parties disagree as to which law governs the interpretation of the LM Agreement and the enforceability of the LM limitation of liability clause. The LM Agreement does not contain a choice-of-law provision. In diversity cases, the federal court applies the choice of law principles of the forum state in which it sits to determine which state's substantive laws will apply. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). Illinois uses the "most significant contacts" test from the Restatement (Second) of Conflicts § 188 (1971) in all choice-of-law disputes involving contracts, so that the laws of the state with the most significant contacts apply. *Hinc v. Lime-O-Sol Co.,* 382 F.3d 716, 719 (7th Cir. 2004). The most significant contacts analysis includes "the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties." *Id.* (quotations and citations omitted).

LM and BBSS disagree as to which state has the most significant contacts; LM argues that Illinois law should apply and BBSS argues for Wisconsin law. However, the court need not

4

determine which state's law applies because the outcome would be the same in either state. As discussed in more detail below, under either Illinois or Wisconsin law, the LM limitation of liability clause is valid and enforceable.

**B. The LM Limitation of Liability Clause is Enforceable**

Both Wisconsin and Illinois law generally recognize that parties may shift risk of negligence liability by contract. *See Harris v. Walker*, 519 N.E.2d 917, 919 (Ill. 1988) ("Regarding contracts that shift the risks of one's own negligence to another contracting party, the general rule is to enforce exculpatory contracts . . . ."); *Rainbow Country Rentals and Retail v. Ameritech Publ'g, Inc.*, 706 N.W.2d 95, 103-07 (Wis. 2005) (holding that a stipulated damages clause in a contract for a business listing in a telephone directory was valid and enforceable). A clause that shifts risk of liability by contract can remove all of a party's potential liability (often referred to as an exculpatory clause), or can limit the total amount of damages one party can pay. *See Rainbow Country*, 706 N.W.2d at 105 (noting the difference between an exculpatory clause releasing a party from all liability and a stipulated damages clause limiting damages). Here, the LM limitation of liability clause purports to limit the amount of damages LM can pay BBSS to the amount of the fees that BBSS paid to LM under the contract. As such, it can be described as either a partial exculpatory clause or a stipulated damages clause.

At the outset, the court notes that BBSS erroneously argues that neither Wisconsin nor Illinois law allows a contractual limitation of damages provision to apply to a tort claim, and fails to examine any relevant law on the issue. (*See* BBSS's Resp. in Opp'n to LM's Mot. for Summ. Determination ("BBSS Opp'n") at 7-9 ("There is no case law in Wisconsin that applies a limitation of damage clause set forth in a contract to tort causes of action. . . . There is no legal basis [under Illinois law] that provides [for] the application of contract language to tort claims

made by Plaintiff in its Amended Complaint.).) Instead of addressing whether or not the LM limitation of liability clause is valid and enforceable under the laws of Illinois or Wisconsin, BBSS inexplicably argues as to its ability to bring both the tort actions and the contract actions, including a discussion of Illinois' *Moorman* doctrine.[3] (*See* BBSS Opp'n at 7-13.) However, this argument is irrelevant to the current motion because LM does not contend that BBSS was barred from bringing the tort claims. At issue in this motion is whether or not the limitation of liability clause limits LM's potential liability, including the tort claims, to $43,500.

1.  **Enforceability under Illinois law**

Although exculpatory clauses are not favored under Illinois law and are to be construed strictly against the party they benefit, for "contracts that shift the risks of one's own negligence to another contracting party, the general rule is to enforce exculpatory contracts unless it would be against a settled public policy of the State to do so, or there is something in the social relationship of the parties militating against upholding the agreement." *Harris*, 519 N.E.2d at 919; *Hamer v. City Segway Tours of Chicago, LLC*, 930 N.E.2d 578, 581 (Ill. App. Ct. 2010) (upholding a release between Segway tour company and a tour participant); *see also Winston Network, Inc. v. Indiana Harbor Belt R.R. Co.*, 944 F.2d 1351, 1359 (7th Cir. 1991) ("Illinois courts will generally enforce contracts of indemnity against one's own negligence."). An exculpatory clause must "spell out the intention of the parties with great particularity and will not be construed to defeat a claim which is not explicitly covered by [its] terms." *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 493 N.E.2d 1022, 1029-30 (Ill. 1986) (finding that an exculpatory clause in a lease did not prevent the third-party tenant from bringing a contribution action against

---

[3]   Illinois' *Moorman* doctrine provides that a plaintiff may not recover damages under a tort theory, including negligence, for a purely economic loss. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (1982). There is an exception to the doctrine that allows for recovery for negligent misrepresentation by a person "who is in the business of supplying information for the guidance of others in their business transactions." *Id.* at 89.

the beneficiary of the clause). The Illinois Supreme Court has stated that for exculpatory clauses in contracts that do not involve publicly regulated areas, there is a "widespread policy of permitting competent parties to contractually allocate business risks as they see fit." *McClure Eng'g Assocs., Inc., v. Reuben Donnelley Corp.*, 447 N.E.2d 400, 402-03 (Ill. 1983). Indeed, in discussing Illinois law on exculpatory clauses, the Seventh Circuit has stated:

> [I]n Illinois, at least when contracts between parties of relatively equal bargaining strength are being construed, the risk that a party will be guilty of negligence is treated like any other commercial risk that may cause harm to the other party to a commercial transaction. In the evaluation of foreseeable commercial risks, Illinois seems to attach greater importance to the commercial interest in certainty than to the policy of deterring negligence.

*Rutter v. Arlington Park Jockey Club,* 510 F.2d 1065, 1067 (7th Cir. 1975) (quoting *Gates Rubber Co. v. USM Corp.*, 508 F.2d 603, 614 (7th Cir. 1975)).

In *Rosenstein v. Standard & Poor's Corp.*, 636 N.E.2d 665 (Ill. App. Ct. 1993), an Illinois appellate court affirmed the dismissal of the plaintiff's negligent misrepresentation claims against Standard and Poor's Corporation ("S & P") because of an exculpatory clause in the license agreement between S & P and the Chicago Board Options Exchange ("CBOE"). *Id.* at 666. The exculpatory clause at issue stated, in bold, "S & P makes no warranty, express or implied, as to results to be obtained by any person or any entity from the use of the S & P indexes or any data included therein . . . CBOE Rules shall expressly include [this] disclaimer language . . . ." *Id.* at 667. The plaintiff held 241 option contracts with CBOE. *Id.* at 666. The court found that, because S & P was in the business of supplying information for the guidance of others in their business transactions, the *Moorman* doctrine did not preclude the plaintiff's recovery for economic losses. *Id.* at 669-70. Nevertheless, the court affirmed the lower court's dismissal, because the exculpatory clause "directly relate[d] to the transactions upon which plaintiff's cause of action is predicated." *Id.* at 671. The court held that the clause was valid

7

because "there [was] no claim of disparity in bargaining power . . . the relationship between plaintiff and S & P was voluntarily entered into and not of such a semi-public character that limitations upon liability might be contrary to public policy." *Id.* at 672.

Here, the LM limitation of liability clause applies to all of BBSS's claims in its amended complaint because all of the claims directly relate to LM's performance under the agreement. The LM limitation of liability clause states that it covers "all claims arising out of, in connection with, or resulting from the performance of this Agreement . . . ." (LM Agreement at 4.) Count I of the amended complaint, a breach of contract claim, is plainly a claim arising from LM's performance of the LM Agreement. Despite BBSS's argument to the contrary, Counts II, III, and IV are all directly based on LM's performance under the LM Agreement.[4] Count II, for "ordinary negligence," states that "LM failed to properly carry out its *duties and obligations* to BBSSI and was *negligent of its services* for BBSSI" (Am. Compl. ¶ 19 (emphasis added)), Count III, for "professional negligence," states that LM "committed errors and omissions as aforesaid *in performing its professional services* and failed to properly carry out its *duties and obligations* to BBSSI as licensed professionals in the fields of engineering and construction" (*Id.* ¶ 23 (emphasis added)), and Count IV, for negligent misrepresentations, states "LM made numerous erroneous and negligent misrepresentations to BBSSI *in connection with the Project*." (*Id.* ¶ 26 (emphases added).) All of these claims are based on LM's alleged failure to perform its duties and services under the LM Agreement. BBSS has failed to identify any other "duties or obligations" LM owed to BBSS outside of those specified by the LM Agreement. Although the

---

[4] BBSS argues that because the clause covers only claims that arose from the LM Agreement and "not any claims which are outside of the agreement," "pleading professional negligence and negligent misrepresentation show[s] that claims outside the contract were made, [sic] possible by law and not precluded by the contract itself and should be left for determination by the fact-finder." (BBSS Opp'n at 7.) Yet, BBSS does not explain how the professional negligence and negligent misrepresentation claims were based on conduct that was not connected to the LM Agreement. Because both claims are based on LM's alleged inadequate conduct in fulfilling its duties under the LM Agreement, the claims fall squarely within the clause's provisions.

wording of the LM limitation of liability clause is fairly broad, it limits the range of claims covered to those that are connected to the contract. Thus, the LM limitation of liability clause applies to all of claims BBSS alleged in its amended complaint.

Next, there do not appear to be any public policy grounds that preclude enforcement of the clause, nor does the relationship of the parties prevent enforcing the agreement. The court is unaware, and BBSS does not address the issue, of any public policy in Illinois that would invalidate a liability limiting provision in a contract where a financing party hires a consultant to review and monitor a construction project. Meanwhile, the parties' relationship as competent commercial entities entering into a contract does not require invalidating the clause. BBSS has not argued or presented any evidence indicating that it is not a competent commercial entity, or that it had inferior bargaining power in negotiating the LM Agreement.[5] *See Chicago Steel Rule & Die Fabricators Co. v. ADT Sec. Sys.,* 763 N.E.2d 839, 845 (Ill. App. Ct. 2002) (noting that the plaintiff "is a commercial entity and there is no evidence of disparity in the bargaining power of the parties to the contract" in affirming the lower court's dismissal of the plaintiff's claims based on an exculpatory clause). In essence, the clause "contractually allocate[d] business risks," capping LM's liability to the amount of the fees paid for its services. *See McClure Eng'g*, 447 N.E.2d at 402-03.

### 2. Enforceability under Wisconsin law

Similar to Illinois law, exculpatory clauses are not favored under Wisconsin law. An exculpatory contract "must be construed strictly against the party seeking to rely on it," and is

---

[5] BBSS does dispute LM's claim that BBSS is a "highly sophisticated entity that entered into the LM Agreement in a position of superior bargaining power," and asks the court to disregard these "facts" because they were not listed as material facts. (BBSS Opp'n at 13.) However, BBSS need not be "highly sophisticated" or have "superior bargaining power" for the clause to be enforceable. *See McClure Eng'g*, 447 N.E.2d at 403 (discussing the "widespread policy" of allowing "competent parties" to "allocate business risks" through contract); *see also Rutter*, 510 F.2d at 1067 (discussing Illinois' policy of treating contractual clauses pertaining to negligence as any other commercial risk when the contract is between parties of "relatively equal bargaining power").

analyzed based on contract law principles and on public policy grounds. *Atkins v. Swimwest Family Fitness Ctr.*, 691 N.W.2d 334, 338 (Wis. 2005) (holding that a swim facility's liability waiver was unenforceable as against public policy). Wisconsin law differentiates between an exculpatory clause and stipulated damages clause. *Rainbow Country*, 706 N.W.2d at 105. For a stipulated damages clause, "the overall single test of validity is whether the clause is reasonable under the totality of circumstances," which requires examining the reasonableness at "the time of the formation and at the time of the breach." *Id.* at 103-04 (quotations omitted). The Wisconsin Supreme Court looks to three main factors in determining a stipulated damages clause's reasonableness: "(1) whether the parties intended to provide for damages or for a penalty; (2) whether the injury caused by the breach would be difficult or incapable of accurate estimation at the time of entering into the contract," with the harder it is to calculate damages, the more reasonable the stipulated damages; and "(3) whether the stipulated damages are a reasonable forecast of the harm caused by the breach." *Id.* at 103 (citation omitted). The harm caused by the breach includes the anticipated harm "at the time of contract formation and the actual harm at the time of breach." *Id.* (citation omitted). "The factors are not meant to be mechanically applied, and courts may give some factors greater weight than others." *Id.* (quotations and citations omitted).

Additionally, Wisconsin also considers the policy grounds favoring and disfavoring a stipulated damages clause. The factors favoring enforcement of such a clause include allowing parties to control their exposure to risk, avoiding the uncertainty, delay and expense of the judicial process, allowing parties to create a "remedy consistent with economic efficiency in a competitive market," as well as general policy considerations favoring freedom to contract. *Id.* (quotations omitted) Conversely, the Wisconsin Supreme Court also recognizes that stipulated

damages are an exception to the general rule that "public law, not private law, ordinarily defines the remedies of the parties," and thus "courts must ensure that the private remedy does not stray too far from the legal principle of allowing compensatory damages." *Id.*

In *Rainbow Country,* the Wisconsin Supreme Court held that a stipulated damages clause in a contract between two businesses for a telephone book advertisement was a "reasonable award of damages in light of the completely speculative damages that [the plaintiff] may have suffered." 706 N.W.2d at 104. Noting that it had found *every* exculpatory contract it had reviewed over the previous 25 years to be unenforceable, the court stated that there was a "fundamental difference" between an exculpatory clause attempting to "avoid *all* liability for death or serious personal injuries arising from virtually any conduct, including intentional or reckless acts, of the owner operator," and a stipulated damages clause where "one business entity agree[s] to limit the maximum financial recovery for a potential mistake of the other business entity." *Id.* at 105.

Applying Wisconsin law to the LM limitation of liability clause at issue here, the clause is valid and enforceable. First, the LM limitation of liability clause is more similar to the stipulated damages clause at issue in *Rainbow Country* than to the exculpatory clauses that the Wisconsin Supreme Court has consistently held to be unenforceable. *See Rainbow Country*, 706 N.W.2d at 105. The LM limitation of liability clause does not attempt to avoid all liability for a personal injury, but instead involves two businesses agreeing to limit one party's liability to the amount of the fees paid to that party for its services. *Id.* at 105. Based on the totality of the circumstances factors discussed in *Rainbow Country*, the clause is reasonable and therefore valid. The first factor is not relevant to this clause because there is no indication that the clause was intended to be a penalty. Because the second and third factors are "intertwined" and require

11

looking at the reasonableness at the time of contracting and the time of the breach, they are examined together. *Id.* at 104. The potential damages resulting from a breach by LM were extremely difficult to estimate at the time of the contracting given their entirely speculative nature. An accurate forecast of potential damages - beyond the cost of the fees paid under the contract - was nearly impossible given the multitude of factors that could influence the amount of damages. Even at the time of the alleged breach, LM's potential liability is difficult to ascertain because other parties had an integral role in causing any harm, and there are a number of variables that could alter the amount of LM's liability to BBSS. By its nature, a consulting services contract to evaluate and monitor a third party is likely to have unpredictable consequential damages resulting from a breach by the consulting party. *See e.g.*, *Wartsila NSD N. Am.,, Inc. v. Hill Int'l, Inc.*, 530 F.3d 269, 278 (3d. Cir. 2008) (holding that, under Maryland law, an exculpatory clause in the plaintiff construction company's contract with a consulting firm was enforceable to limit the consulting firm's damages and stating that "some of the damages submitted to the jury resulted from a long series of contingent events, each one dependent upon specific decisions made by [the plaintiff] based upon the facts and interests before it at the time") Because of this unpredictability, the LM limitation of liability clause's provision for returning the fees paid for services is a reasonable damages provision.

Wisconsin's public policy considerations for a stipulated damages clause also favor enforcing the LM limitation of liability clause. Allowing two business parties to allocate risk through a contract is economically efficient because it allows the parties to factor potential risk exposure into the contract's terms. *See Rainbow Country*, 706 N.W. 2d at 103. This is especially important where a contract for consulting services could potentially lead to liability much greater than the value of the actual services. Indeed, the alleged $26,168,876 that BBSS

advanced in connection with the Project dwarfs the $43,500 in total fees paid to LM under the LM Agreement. Without a limitation of liability clause, such services may not be economically feasible for the consultant. Additionally, avoiding the uncertainty and expense of the judicial process is valuable where potential liability is entirely speculative and, at least possibly, dependent on other parties. *See Rainbow Country*, 706 N.W. 2d at 103.

As a court in another state has noted, a limitation of liability clause can limit damages without eliminating a consulting party's "substantial interest in exercising due care" in performing under the contract by making the damages the "very thing that induced [the consultant] to enter into the contract in the first place," the fees paid for the consultant's services. *Ocotillo, LLC v. WLB Grp., Inc.*, 196 P.3d 222, 225 (Arizona 2008) (holding that a clause limiting a surveying firm's liability to the amount of fees paid in a contract with a real estate developer was enforceable and not against public policy under Arizona law). Here, the terms of the LM limitation of liability clause do not justify judicial interference as the contractual remedy provided is reasonable given that LM would be liable for the full amount of fees it was paid. As in *Rainbow Country*, even though BBSS may have been completely innocent, the return of the fees paid to LM "were all the parties contemplated and agreed to," and there is no policy reason to invalidate the clause. *See Rainbow Country*, 706 N.W. 2d at 106.

Thus, under both Illinois and Wisconsin law, the LM limitation of liability clause is valid and enforceable. Notably, BBSS's amended complaint does not contain any allegations that LM acted intentionally or that LM's conduct was willful or wanton, which would fall outside the scope of the LM limitation of liability clause. *See Cat Iron, Inc. v. Bodine Envtl. Servs.,* No. 10-CV-2102, 2010 WL 3767986, *3 (C.D. Ill. Sept. 28 2010) (denying the defendant's motion for

advanced in connection with the Project dwarfs the $43,500 in total fees paid to LM under the LM Agreement. Without a limitation of liability clause, such services may not be economically feasible for the consultant. Additionally, avoiding the uncertainty and expense of the judicial process is valuable where potential liability is entirely speculative and, at least possibly, dependent on other parties. *See Rainbow Country*, 706 N.W. 2d at 103.

As a court in another state has noted, a limitation of liability clause can limit damages without eliminating a consulting party's "substantial interest in exercising due care" in performing under the contract by making the damages the "very thing that induced [the consultant] to enter into the contract in the first place," the fees paid for the consultant's services. *Ocotillo, LLC v. WLB Grp., Inc.*, 196 P.3d 222, 225 (Arizona 2008) (holding that a clause limiting a surveying firm's liability to the amount of fees paid in a contract with a real estate developer was enforceable and not against public policy under Arizona law). Here, the terms of the LM limitation of liability clause do not justify judicial interference as the contractual remedy provided is reasonable given that LM would be liable for the full amount of fees it was paid. As in *Rainbow Country*, even though BBSS may have been completely innocent, the return of the fees paid to LM "were all the parties contemplated and agreed to," and there is no policy reason to invalidate the clause. *See Rainbow Country*, 706 N.W. 2d at 106.

Thus, under both Illinois and Wisconsin law, the LM limitation of liability clause is valid and enforceable. Notably, BBSS's amended complaint does not contain any allegations that LM acted intentionally or that LM's conduct was willful or wanton, which would fall outside the scope of the LM limitation of liability clause. *See Cat Iron, Inc. v. Bodine Envtl. Servs.,* No. 10-CV-2102, 2010 WL 3767986, *3 (C.D. Ill. Sept. 28 2010) (denying the defendant's motion for

partial summary judgment because an otherwise valid and enforceable damages limitation clause did not apply to the willful and wanton misconduct claims alleged by the plaintiff).

**C. Subject Matter Jurisdiction**

Because the LM limitation of liability clause is valid, BBSS's potential recovery for LM's alleged breach, including BBSS's tort claims, is limited to $42,500. This amount is below the $75,000 required for subject matter jurisdiction for diversity of citizenship. 28 U.S.C. § 1332(a). This court has the power to dismiss for want of jurisdiction based on the validity of the limitation of liability clause limiting damages to below the jurisdictional requirement. *Pratt Central Park Ltd P'ship v. Dames & Moore, Inc.,* 60 F.3d 350, 353 (7th Cir. 1995) ("[T]he district judge possesses the power to eject a case when a contract holds damages below the jurisdictional amount.") In *Pratt*, the Seventh Circuit stated that it agreed with the principle that "a court has the power to dismiss for want of jurisdiction after deciding that a limitation-of-liability clause (or a state statute) caps damages at less than the jurisdictional amount." *Pratt*, 60 F.3d at 353. Therefore, because BBSS's potential recovery is capped below the amount required for subject matter jurisdiction, BBSS's claims are dismissed.

## IV. CONCLUSION

For the foregoing reasons, LM's motion for partial summary judgment is granted. Because this action fails to meet the jurisdictional amount in controversy requirement for diversity jurisdiction, the case is dismissed for lack of subject matter jurisdiction.

ENTER:

                                                /s/
                                      JOAN B. GOTTSCHALL
                                      United States District Judge

DATED: March 7, 2011